# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

## EASTERN DIVISION

| | | |
|---|---|---|
| ISRAEL HERNANDEZ, a minor, by and through his mother, LUZ GONZALEZ, | ) ) ) | |
| Plaintiff, | ) ) | No. 10-CV-4124 |
| v. | ) ) | Judge Joan H. Lefkow |
| DR. DELIA TAPIA and ASCENSION HEALTH, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff, Israel Hernandez ("Israel"), a minor, by and through his mother, Luz Gonzalez

("Luz"), filed a three-count complaint against Dr. Delia Tapia and Ascension Health, Inc.

("Ascension") alleging that Dr. Tapia and Ascension are liable for injuries that Israel suffered

during and after his birth at St. Cabrini Hospital.[1]  Count I of Israel's complaint alleges that

Dr. Tapia failed to properly render appropriate and timely anesthesia care during plaintiff's birth.

Counts II and III allege that Ascension is liable for negligent acts that were performed by other

medical personnel at the hospital.  Before the court are Ascension's and Dr. Tapia's motions to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that plaintiff's

---

[1] This case was removed to the court from the Circuit Court of Cook County, Illinois, pursuant to 28 U.S.C. § 1441.  Plaintiff and his mother are citizens of Illinois, Ascension is a non-profit organization organized under the laws of Missouri with its principal place of business in Missouri, and Dr. Tapia is a citizen of Indiana who resides and works in Indiana.  The court therefore has jurisdiction over plaintiff's claims under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

claims are precluded by the doctrine of *res judicata* and that plaintiff has forfeited his right to bring the instant claims by entering into a release agreement upon termination of a prior proceeding. For the following reasons, Ascension's motion [# 24] is granted and Dr. Tapia's motion [# 22] is denied.

## BACKGROUND[2]

### I.     Israel's Birth at St. Cabrini Hospital

On May 23, 1995, Luz presented to St. Cabrini Hospital with the signs and symptoms of labor. Luz received care and treatment from the medical personnel at the hospital, including Dr. Tapia, an anesthesiologist. Luz was Dr. Tapia's patient and Dr. Tapia had a duty to provide medical care in accordance with accepted standards of medical practice. Dr. Tapia failed to provide appropriate and timely anesthesia to Luz, and Israel was injured as a result of her actions.

The nurses, employees, and staff physicians at St. Cabrini Hospital, including but not limited to Drs. James A. Threatte and Kenneth E. Johnson, were also careless and negligent in the medical treatment that they provided to Luz and Israel. In particular, the medical personnel at St. Cabrini Hospital failed to properly assess and report their patients' conditions, consult with a specialist capable of determining their conditions, timely order appropriate tests, properly assess and report the test results, and timely deliver Israel even though there were signs of fetal distress. The medical personnel at St. Cabrini Hospital carelessly and negligently prescribed medications, and Israel was injured as a result.

---

[2] Unless otherwise indicated, the facts are taken from the complaint and presumed to be true for the purpose of resolving the pending motions. The court also takes judicial notice of matters of public record. *See United States* v. *Wood*, 925 F.2d 1580, 1581–82 (7th Cir. 1991).

**II.      The Relationship Between Ascension and St. Cabrini Hospital**

Defendant Ascension is a Missouri non-profit that was created in 1999 by uniting several Catholic healthcare ministries located in the United States.  It has created the largest Catholic healthcare ministry in the United States, divided into approximately thirty-eight individual healthcare ministries located primarily in the Midwest and the Northeast.  Ascension's relationship with St. Cabrini Hospital has evolved as follows.

In 1995, several Catholic hospitals and healthcare providers in the Chicago area agreed to consolidate their operations and coordinate the delivery of medical services pursuant to a written Affiliation Agreement.  The Affiliation Agreement reorganized the Columbus-Cabrini Health System and renamed it Catholic Health Partners ("CHP"), which is an Illinois non-profit.  CHP was in turn the sole corporate member of the Columbus-Cabrini Medical Center ("CCMC"), an Illinois non-profit that operated four community-based hospitals in Chicago as divisions of CCMC.  St. Cabrini Hospital was one of the hospitals operated by CCMC.  CHP operated as a shell corporation without any assets other than its interest in CCMC, and CHP and CCMC operated as a single corporation.

Pursuant to the Affiliation Agreement, CHP and CCMC sold the land and buildings that comprised St. Cabrini Hospital and transferred the operation of St. Cabrini Hospital to St. Anthony Hospital.  The financial condition of CHP and CCMC subsequently deteriorated, in part because the Affiliation Agreement required that they pay $1,500,000 of the proceeds of the sale of St. Cabrini's assets to the Missionary Sisters of the Sacred Heart.

By 2001, CHP and CCMC were concerned that they would have to liquidate.  As a result, they made an agreement with Ascension to transfer substantially all of their assets, as well as

control of St. Anthony Hospital, to Ascension. Ascension allowed CHP and CCMC to join its network of Catholic health care providers and agreed to pay all of the debts and liabilities of CHP and CCMC. Ascension also entered into an Assumption Agreement with CHP and CCMC, whereby Ascension agreed to assume liability for all damages and injuries resulting from medical malpractice claims against CHP, CCMC, and any other entity or person that had provided medical services to patients at St. Cabrini Hospital. The Assumption Agreement had an effective date of July 1, 2002 and Ascension thereby agreed to assume liability for the claims that plaintiff has asserted against Dr. Tapia and for injuries caused by the other medical personnel who attended Israel's birth at St. Cabrini Hospital.

Also on July 1, 2002, CHP, CCMC, and Ascension executed the First Amendment to the 1995 Affiliation Agreement. The Amendment reorganized CCMC and renamed it Catholic Health Partners Services ("CHPS") and provided that CHPS would operate St. Anthony Hospital. The Amendment gave Ascension extensive reserved powers over CHP and CHPS, including the power to sell, transfer, or change the use of their assets and the power to appoint or remove the majority of the members of their board of directors.[3] Ascension exercised total control over CHP and CHPS and their assets and included their financial operations as part of Ascension's consolidated financial statements. CHP and CHPS were therefore merged into or consolidated with Ascension and, pursuant to this merger, Ascension became directly responsible for injuries arising from medical malpractice claims against medical service providers at St. Cabrini Hospital, including plaintiff's medical malpractice claims against Dr. Tapia and other medical personnel. CHP separated from Ascension under a Separation

---

[3] Prior to the reorganization of CMMC, CHP and CMMC had a the same officers and directors.

Agreement dated May 28, 2009. Ascension relinquished its control over CHP and CHPS and CHP thereafter operated St. Anthony Hospital as a freestanding Catholic hospital.

## III.    Procedural History

This case has a lengthy procedural history that is recounted here because it is relevant to the court's analysis of the pending motions.

Plaintiff first filed suit in Cook County Circuit Court in 2001. Plaintiff's first amended complaint named the following defendants: CHPS, doing business as Columbus-Cabrini Medical Center and St. Cabrini Hospital, Dr. James A. Threatte, Dr. Bladel, and Dr. Kenneth E. Johnson. Ascension's Mot. to Dismiss Ex. 2. Ascension was added as a defendant in December 2006. *Id.* Ex. 8. On January 31, 2007, plaintiff filed a Tenth Amended Complaint, which alleges that (i) various staff physicians and employees at St. Cabrini Hospital, including Dr. Tapia, were negligent in providing medical care to plaintiff and his mother, (ii) Ascension controlled both CHPS and CHP and the assets and liabilities of both CHPS and CHP had been transferred to Ascension as of July 1, 2002, and (iii) Ascension had assumed the obligation to pay for damages resulting from the acts of agents and employees of St. Cabrini Hospital. *Id.* Ex. 1 ¶¶ 3–4, 19, 27, 32. On March 14, 2007, plaintiff agreed to voluntarily dismiss his claims against Ascension and CHP without prejudice. *Id.* Exs. 10, 18 at 4–5. The transcript of the hearing before Judge Richard Elrod, the trial judge, indicates that this was done to expedite the determination of liability while leaving plaintiff with the opportunity to re-file against Ascension in the event that a jury verdict exceeded the remaining defendants' insurance coverage. Pl.'s Reply to Ascension's Mot. to Dismiss Ex. C at 4 (statement by the *guardian ad litem* that, "When counsel says without prejudice, that would mean even post verdict were the case to go forward to trial,

[Ascension] would still be susceptible to answering either collateral issues or direct liability."),
34 (Judge Elrod stating, "I'm not dismissing with prejudice anybody, even Ascension. . . . And if
there's any type of excessive verdict, excessive of the insurance coverage . . . [dismissal of
Ascension without prejudice] would have no bearing on what was done post trial for discovery
of assets and for whatever liability may have been assumed by [CHP] and [CHPS].").

At a hearing before Judge Elrod on May 1, 2007, CHP, CHPS, and St. Cabrini Hospital
offered to settle plaintiff's claims for $11 million, and Dr. Threatte offered to settle for $1
million. Pl.'s Opp. to Ascension's Mot. to Dismiss Ex. D at 8. Plaintiff, through his mother and
father, rejected the offer. *Id.* Judge Elrod then removed Luz as Israel's guardian for the lawsuit
and gave Israel's *guardian ad litem* ("GAL") authority to accept a settlement offer. *Id.*; *see also*
Ascension's Mot. to Dismiss Ex. 11. The GAL accepted the $12 million settlement offer and on
May 15, 2007 the case was dismissed with prejudice and the Circuit Court retained jurisdiction
only for the purpose of approving the terms of settlement. Ascension's Mot. to Dismiss Exs. 11,
12.

On September 26, 2007, the GAL executed a release agreement that forfeits plaintiff's
right to bring claims arising from "any and all professional services, advice and medical care
provided to, or which allegedly should have been provided to [Luz] or [Israel] . . . including, but
not limited to, the claims made or could have been made in the [current] lawsuit." *Id.*, Ex. B at
1. The release agreement provides that the following entities and individuals would be released
from future liability to plaintiff: CHP, CHPS, St. Cabrini Hospital, Columbus-Cabrini Medical
Center, and Columbus Hospital, Dr. Johnson, and "any and all of their actual agents and
employees, whether professional, paraprofessional or non-professional, whether full-time or

part-time . . . and any attorneys, assigns, and successors of the aforesaid entities." *Id.* Plaintiff entered into a separate settlement and release agreement with Dr. Threatte. On December 19, 2007, Judge Elrod entered an order stating that the settlement was fair and reasonable and approved plaintiff's petition for approval of settlement and disbursement of proceeds. Ascension's Mot. to Dismiss Ex. 17.

## LEGAL STANDARD

Release and *res judicata* are both affirmative defenses, and therefore defendants should properly raise them in a responsive pleading and then file a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See* Fed. R. Civ. P. 8(c); *Carr* v. *Tillery*, 591 F.3d 909, 912–13 (7th Cir. 2010) (*res judicata* is an affirmative defense); *Deckard* v. *Gen. Motors Corp.*, 307 F.3d 556, 561 (7th Cir. 2002) (release is an affirmative defense). The plaintiff has not objected on this basis, however. Defendants' error is inconsequential, however, because a motion for judgment on the pleadings under Rule 12(c) is evaluated using the same standard that would be applied to a Rule 12(b)(6) motion to dismiss. *See Hayes* v. *City of Chicago*, No. 10 C 3378, 2010 WL 4627716, at *2 (N.D. Ill. Nov. 3, 2010) (citing *Carr*, 591 F.3d at 913). Accordingly, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). The court makes its determination based on the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. Fed. R. Civ. P. 10(c); *N. Indiana Gun & Outdoor Shows, Inc.* v. *City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The court may take judicial notice of documents that are part of the public record,

including pleadings, orders, and transcripts from the prior proceedings. *See Gen. Elec. Capital Corp.* v. *Lease Res. Corp.*, 128 F.3d 1074, 1081–82 (7th Cir. 1997).

## ANALYSIS

### I.     Ascension's Motion to Dismiss

Ascension presents two arguments in favor of its motion to dismiss. First, it asserts that plaintiff's claims against Ascension are premised on allegations of successor liability, and that as such they fall within the scope of the claims that plaintiff forfeited in the release agreement. Second, Ascension argues that Illinois principles of *res judicata*, which preclude claim splitting, prohibit plaintiff from re-filing the claims against Ascension that were voluntarily dismissed in the prior proceeding. For the following reasons, the court concludes that the facts alleged in the complaint would establish that Ascension is a "successor" to the institutional defendants in the prior proceeding and therefore plaintiff's claims fall within the scope of the release agreement.

A release agreement is "a contract wherein a party relinquishes a claim to a person against whom the claim exists, and a release is subject to the rules governing the construction of contracts." *Hagene* v. *Derek Polling Const.*, 902 N.E.2d 1269, 1272, 388 Ill. App. 3d 380, 327 Ill. Dec. 883 (2009) (quoting *Carona* v. *Ill. Cent. Gulf R.R. Co.*, 561 N.E.2d 239, 242, 203 Ill. App. 3d 947, 148 Ill. Dec. 933 (1990)); *see also Hampton* v. *Ford Motor Co.*, 561 F.3d 709, 714–15 (7th Cir. 2009).[4] The court's "primary objective in construing a contract is to give effect to the intent of the parties." *Hampton*, 561 F.3d at 714 (citing *Vill. of S. Elgin* v. *Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 670, 348 Ill. App. 3d 929, 284 Ill. Dec. 868 (2004)). Illinois follows

---

[4] The court applies state law to issues relating to the construction of a release agreement. *See Sims-Madison* v. *Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 448 (7th Cir. 2004). All of the relevant events in this case occurred in Illinois, and the parties appear to agree that Illinois law should govern.

the objective theory of intent; therefore the court looks first to the language of the agreement. *Newkirk* v. *Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008) (citing *Vill. of S. Elgin*, 810 N.E.2d at 670). "Where a contractual release is clear and explicit, [the court] must enforce it as written." *Hampton*, 561 F.3d at 714. Thus, while courts frequently look to the circumstances of the transaction to determine the meaning of general or all encompassing terms in a release agreement, *see Carlile* v. *Snap-On Tools*, 648 N.E.2d 317, 321, 271 Ill. App. 3d 833, 207 Ill. Dec. 861 (1995), the court should rely on the plain meaning of the agreement if the language is not ambiguous. *See AA Sales & Assocs., Inc.* v. *JT & T Prods. Corp.*, No. 98 C 7954, 2000 WL 1557940, at *2 (N.D. Ill. Oct. 19, 2000), *aff'd* 24 F. App'x 605 (2001).

The release agreement states, in relevant part:

In this document the following definitions apply:
. . .

**Releasees –** Catholic Health Partners, Catholic Health Partners Services, St. Cabrini Hospital, Columbus-Cabrini Medical Center, Columbus Hospital, Kenneth E. Johnson, D.O., and any and all of their actual agents and employees . . . the Chicago Hospital Risk Pooling Program, and *the attorneys, assigns and successors of the aforesaid entities*.

Ascension's Mot. to Dismiss Ex. 14 (emphasis added).[5] Nearly identical language appears in the

---

[5] In accordance with Federal Rule of Evidence 201(b), the court takes judicial notice of the text of the release agreement, which was submitted as an exhibit to Ascension's motion. *See Gen. Elec. Capital Corp.*, 128 F.3d at 1081 ("A court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b)); *Boeckman* v. *A.G. Edwards, Inc.*, 461 F. Supp. 2d 801, 808 n.6 (S.D. Ill. 2006) (taking judicial notice of release agreement in evaluating Rule 12(c) motion); *IBJ Whitehall Bank & Trust Co.* v. *Cory & Assocs., Inc.*, No. 97 C 5827, 2001 WL 648956, at *1 n.1 (N.D. Ill. Jun. 6, 2001) (taking judicial notice of settlement agreement); *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, No. 92 C 7768, 1998 WL 808986, at *3 n.2 (N.D. Ill. Nov. 17, 1998) (taking judicial notice of settlement agreement). The parties do not dispute the authenticity of the release agreement, the text of the agreement, or that plaintiff's representative executed the agreement.

Circuit Court's order of August 30, 2007, in which the parties were directed to draft and execute a release agreement. *Id.* Ex. 13 ("Catholic Health's attorneys shall provide a draft release to [the GAL] . . . including Releasees: Catholic Health Partners, Catholic Health Partners Services, St. Cabrini Hospital, Columbus Cabrini Medical Center, Kenneth E. Johnson, D.O., and their employees, actual agents, insurers, attorneys, assigns and successors . . . .").

The parties do not dispute that the release agreement covers the "successors" of CHP, CHPS, St. Cabrini Hospital, and the other institutional defendants. Nor is there much debate as to whether the complaint alleges that Ascension is alleged to be the "successor" to these institutions. "The term 'successor' with regard to a corporation means another corporation which, through amalgamation, consolidation, or duly authorized legal succession, has acquired the rights and assumed the burdens of the initial corporation." *Toepper* v. *Brookwood Country Club Rd. Assoc.*, 561 N.E.2d 1281, 1285–86, 204 Ill. App. 3d 479, 149 Ill. Dec. 585 (1990); *see also Black's Law Dictionary* (9th ed. 2009) (successor defined as "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation"). Plaintiff has alleged that Ascension assumed total control of CHP and CHPS, received substantially all of the assets of CHP and CHPS, included their operating expenses as part of its financial statements, and agreed to assume the liabilities of CHP, CHPS, and St. Cabrini Hospital by virtue of the Assumption Agreement. In addition, Count III of the complaint, which alleges liability solely against Ascension, is titled "Consolidation or Merger." These allegations, if true, establish that Ascension is being sued based on a theory of successor liability for the liabilities of CHP, CHPS, and St. Cabrini Hospital. *See Vernon* v. *Schuster*, 688 N.E.2d 1172, 1175–76, 179 Ill. 2d 338, 228 Ill. Dec. 195

(1997) (general rule is that successor corporation is not liable for liabilities of transferor corporation, however there is an exception where there is an express agreement of assumption or the transaction amounts to a consolidation or merger).

Plaintiff, in response to Ascension's motion, has cited portions of the transcripts from the prior proceeding where Judge Elrod indicated that he did not want Ascension to be released pursuant to the agreement. *See* Pl.'s Resp. to Ascension's Mot. to Dismiss Ex. H at 13 ("I would not release Ascension . . . . They are not a party to this, and they may never be."), 16–17 ("I am saying definitely that Ascension is not released."); *id.* Ex. G at 14–15 ("I am not saying anything about Ascension.  I have no reason to believe that Ascension would be at all affected by this."). Illinois law is clear, however, that courts must first look to the plain and ordinary meaning of the term that is subject to interpretation in a release agreement.  If the meaning of the term is clear, then the agreement will be enforced as written.  *AA Sales*, 24 F. App'x at 607 (concluding that the term "successor" was unambiguous in the context of a settlement agreement); *Farmers Auto. Ins. Ass'n* v. *Wroblewski*, 887 N.E.2d 916, 925–26, 382 Ill. App. 2d 688, 320 Ill. Dec. 772 (2008) (because release agreement clearly and unambiguously released "agents" and "employees" of Walgreens, court would not consider parol evidence regarding the parties' intentions to the contrary); *Polsky* v. *BDO Seidman*, 688 N.E.2d 364, 371, 293 Ill. App. 3d 414, 227 Ill. Dec. 883 (1997) (where meaning of the word "agent" as used in release agreement was unambiguous, court refused to consider extrinsic evidence as to a party's intent); *cf. Farmers Auto. Ins. Ass'n* v. *Kraemer*, 857 N.E.2d 691, 695, 367 Ill. App. 3d 1071, 306 Ill. Dec. 292 (2006) (where release contained "general words" and was ambiguous as to whether third party was released from contractual liability, court could properly consider the surrounding

circumstances to determine the parties' intent); *Thornwood, Inc.* v. *Jenner & Block*, 799 N.E.2d 756, 762, 344 Ill. App. 3d 15, 278 Ill. Dec. 891 (2003) ("[G]eneral releases do not serve to release unknown claims, which the party could not have contemplated releasing when it gave the release."). Plaintiff does not contend, however, that the term "successors" is ambiguous and does not dispute that the complaint alleges successor liability on the part of Ascension. Nor does plaintiff assert that there may be another basis for asserting liability against Ascension, which did not exist as a corporate entity at the time of the events that gave rise to the complaint.

While it appears that Judge Elrod may not have intended to release Ascension from liability, the language of the release agreement is clear. *See AA Sales*, 2000 WL 1557940, at *2 (where the operative term was not ambiguous, "the settlement agreement that [plaintiffs] signed determine[d] what they got"). Furthermore, plaintiff was represented by counsel during the prior proceedings and was given the opportunity to provide comments on the language of the agreement. *See* Pl.'s Response to Ascension's Mot. to Dismiss Ex. F at 10–11. Thus plaintiff's counsel agreed to the language in the agreement, and indeed plaintiff does not argue otherwise here. Judge Elrod, moreover, approved the final draft of the release agreement. This court must faithfully construe the language of the agreement that he approved.[6]

Plaintiff also asserts that the GAL was not authorized to release Ascension and that therefore the release, if construed to release Ascension, would be unenforceable. *See* 755 Ill. Comp. Stat. 5/19-8 (representative of a personal estate may compromise a claim of the ward "upon such terms as the court directs"). The agreement, however, was expressly approved by

---

[6] Ascension avers that it is *not* a successor to CHP, CHPS, or St. Cabrini Hospital and thus has no potential liability to plaintiff. This does not affect the court's analysis, which focuses on the allegations in plaintiff's complaint.

court order on December 17, 2007. Ascension's Mot. to Dismiss Ex. 17. Moreover, the language that appears in the agreement mirrors the language that Judge Elrod authorized in his order of August 13, 2007. *Id.* Ex. 13. The cases plaintiff cites do not support plaintiff's argument. They stand only for the general proposition that Illinois law requires the court to approve or reject any settlement agreement that is proposed on behalf of a minor. *See, e.g.*, *Wreglesworth* v. *Arcto, Inc.*, 738 N.E.2d 964, 968, 316 Ill. App. 3d 1023, 250 Ill. Dec. 495 (2000); *see also Ott* v. *Little Co. of Mary Hosp.*, 652 N.E.2d 1051, 1057, 273 Ill. App. 3d 563, 210 Ill. Dec. 75 (1995) ("[W]hen the court believes settlement to be in the minor's best interest, the court may order a prior-appointed guardian or conservator to effectuate settlement; and if that person refuses, may appoint a guardian *ad litem* to settle the case on the minor's behalf." (internal citations omitted)).

For the foregoing reasons, plaintiff's claims against Ascension, as pleaded, fall within the scope of the release agreement. Therefore the court need not consider Ascension's additional argument that plaintiff's claims are barred by the doctrine of *res judicata*. Counts II and III of plaintiff's complaint will be dismissed.

## II.     Dr. Tapia's Motion to Dismiss

The thrust of Dr. Tapia's argument is that plaintiff's claims are barred by *res judicata* because plaintiff has alleged, in this proceeding and in the prior proceeding, that she is in privity with the prior defendants. In her reply brief, Dr. Tapia further asserts that she falls within the scope of the release agreement.

**A.       The Release Agreement**

It is clear that the release agreement does not name Dr. Tapia among those released.  The release agreement further excludes any "apparent agent" of the prior institutional defendants.  The agreement does, however, provide that "any and all . . . actual agents and employees" of the institutional defendants shall be released from future liability.  Dr. Tapia argues that she falls under the scope of the "agents and employees" provision because plaintiff's Tenth Amended Complaint, filed in first action that was settled and resolved in state court, alleges that she was an agent or employee of the institutional defendants and these allegations were the "evidence" that the trial judge relied on in crafting the language of the agreement.

The court will look to principles of contract construction to interpret the agreement.  *See, e.g.*, *Hagene*, 902 N.E.2d at 1272.  The phrase "agents and employees" is not ambiguous and therefore the court will apply the plain meaning of these terms.  An agent is commonly understood as "[o]ne who is authorized to act for or in place of another."  *Black's Law Dictionary* (9th ed. 2009).  An employee is "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance."  *Id.*  Dr. Tapia does not assert that she is or was an agent or employee of CHP, CHPS, St. Cabrini Hospital, or the other institutional defendants in the prior proceeding.  Nor does plaintiff's complaint allege that Dr. Tapia was an agent or employee of the prior institutional defendants.  The complaint states simply that "Dr. Tapia was a physician engaged in the business of offering medical services in the County of Cook, State of Illinois."  Compl. ¶ 3.  The facts alleged in Israel's Tenth Amended Complaint,

filed in the first state court action that did not name Dr. Tapia as a defendant, are immaterial for the purpose of discerning the plain meaning of the agreement and cannot be taken as true in these proceedings. For these reasons, the court concludes that Dr. Tapia has not demonstrated that she was released.

**B.    *Res Judicata***

The doctrine of *res judicata* provides that "a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Hudson* v. *City of Chicago*, 889 N.E.2d 210, 213, 228 Ill. 2d 462, 321 Ill. Dec. 306 (2008).[7] *Res judicata* bars not only what was actually decided in the first action but also what could have been decided. *Id.* For *res judicata* to apply, three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of the cause of action, and (3) there are identical parties or privies in both actions. *Id.*; *Rein* v. *David A. Noyes & Co.*, 665 N.E.2d 1199, 1204, 172 Ill. 2d 325, 216 Ill. Dec. 642 (1996).

Clearly, the first two requirements for *res judicata* are met with respect to Dr. Tapia. Under Illinois law, a dismissal based on a court approved settlement operates as a final adjudication on the merits with respect to any issues that were raised or might have been raised in the proceeding. *4901 Corp.* v. *Town of Cicero*, 220 F.3d 522, 529 (7th Cir. 1999); *Retired Chicago Police Ass'n* v. *City of Chicago*, 7 F.3d 584, 593 (7th Cir. 1993); *People ex rel Ulrich* v. *Bosmann*, 664 N.E.2d 119, 125, 279 Ill. App. 3d 36, 215 Ill. Dec. 722 (1996) ("[T]he dismissal

---

[7] Federal courts recognize the *res judicata* effect of state court judgments. *See* 28 U.S.C. § 1738. The court applies the law of the state that rendered the judgment to determine whether *res judicata* bars plaintiff's claims. *See, e.g.*, *Hicks* v. *Midwest Transit, Inc.*, 497 F.3d 468, 471 (7th Cir. 2007).

with prejudice of a complaint, pursuant to a settlement agreement, is a final judgment on the merits.").  The Circuit Court of Cook County dismissed the prior proceeding, in its entirety with prejudice, for settlement in the amount of $12 million.  Ascension's Mot. to Dismiss Ex. 12. Thus there was a final adjudication on the merits.

To determine whether an identity of cause of action exists, Illinois courts use a transactional test.  *See Doe* v. *Gleicher*, 911 N.E.2d 532, 539, 393 Ill. App. 3d 31, 331 Ill. Dec. 711 (2009).  Under the transactional test, separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief.  *Id.*  The identity of a transaction or series of transactions is determined pragmatically, based on factors such as time, location, and whether the series of events make up a single occurrence.  *Id.*  The present claims and the prior claims filed in state court both arise from the events relating to Israel's birth at St. Cabrini Hospital on May 23, 1995.  Both claims are based on allegations of negligence against the doctors caring for Luz and Israel at that time.  Because both lawsuits stem from the same occurrence and involve nearly identical facts, an identity of cause of action exists between the original and present lawsuits and the second requirement for *res judicata* is met.

Because Dr. Tapia was not a defendant in the prior proceeding, she must be in privity with the prior defendants in order for the third requirement for *res judicata* to be met.  Privity refers to a "derivative interest founded on, or growing out of, contract, connection, or bond of union between parties [or] mutuality of interest." *Purmal* v. *Robert N. Wadington & Assocs.*, 820 N.E.2d 86, 94, 354 Ill. App. 3d 715, 289 Ill. Dec. 578 (2004) (quoting *Black's Law Dictionary* 1199 (6th Ed. 1990)).  Thus, "[a] nonparty may be bound under privity if that

nonparty's interests are so closely aligned to those of a party that the party is the virtual representative of that nonparty." *Id.* The determination of whether privity exists requires careful examination of the circumstances in each case. *Id.* Under Illinois law, a doctor will be considered to be in privity with doctors of the practice group in which she is a member and with the hospital of which she is an agent or employee. *See Neuberg* v. *Michael Reese Hosp. & Med. Ctr.*, 454 N.E.2d 684, 689, 118 Ill. App. 3d 93, 73 Ill. Dec. 587 (1983) (dismissing action based on *res judicata* where plaintiffs alleged in their complaint that one defendant was an associate in the same pediatric practice group as a previously named defendant and that other defendants were agents or employees of the previously named defendant hospital).

Dr. Tapia argues that she is in privity with the defendants in the state court proceedings because plaintiff's complaint alleges that she was an agent or employee of St. Cabrini Hospital, CHP, and Ascension and because the complaint "aligns" Dr. Tapia's position with that of Drs. Threatte and Johnson. Dr. Tapia cites the following allegations from the complaint: (i) Ascension seeks to "control every person in its System, including individual associates and physicians;" (ii) Ascension agreed to be responsible for all injuries and damages from malpractice of "any other entity or person that had provided medical services to patients at St. Cabrini Hospital prior to its closure;" (iii) it was the duty of St. Cabrini Hospital, through its "staff physicians, including Drs. Threatte and Johnson, nurses, employees, and other medical personnel to render hospital services with the medical needs of plaintiffs and in accordance with accepted standards;" (iv) Ascension's "staff physicians, including Drs. Threatte and Johnson, nurses, and other personnel" were negligent in providing medical care for Luz and Israel; and (v) Ascension is liable as a result of "the claims asserted against Dr. Tapia and for all injuries

and damages caused by plaintiff by the other medical personnel." *See* Dr. Tapia's Mot. to Dismiss at 2. Drawing all inferences in plaintiff's favor, *see Dixon*, 291 F.3d at 486 (7th Cir. 2002), these statements do not permit the inference that Dr. Tapia was in privity with the defendants in the state court proceeding. Indeed, only one of the allegations cited by Dr. Tapia even mentions her by name. This statement, which alleges that Ascension agreed to assume liability for claims "against Dr. Tapia and for all injuries and damages caused . . . by the other medical personnel who attended Israel's birth," *see* Compl. ¶ 36, does not establish that Dr. Tapia's interests were aligned with those of the defendants in the prior proceeding. Ascension, moreover, had been dismissed from plaintiff's case as of the time when judgment was entered and, therefore, Dr. Tapia's relationship with Ascension cannot provide the basis for a finding of privity.

Dr. Tapia also cites the allegations in plaintiff's Tenth Amended Complaint, filed in the prior proceeding, as support for her argument that requirement for privity is met. These allegations do not provide evidence from which the court can make a finding regarding privity. Based on the record in *this* proceeding, the court cannot determine the nature of the relationship between Dr. Tapia and the defendants in the prior proceeding. Therefore the third requirement for *res judicata* has not been met. Dr. Tapia's motion to dismiss will be denied.

## CONCLUSION AND ORDER

For the foregoing reasons, Ascension's motion to dismiss [#24] is granted and Counts II and III are dismissed with prejudice. Dr. Tapia's motion to dismiss [#22] is denied. Dr. Tapia has fourteen days to answer the allegations in the complaint.


Dated: December 15, 2010          Enter:_____
                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge